Samuel RUSACK

v.

William H. HARSHA, Stanley L. Bishop, P. J. Kanistros, Poli-Com, Inc.

Civ. No. 77–1137.

United States District Court, M. D. Pennsylvania.

Dec. 14, 1978.

288

Leon P. Haller, Harrisburg, Pa., for plaintiff.

Gregory C. Karas, Dayton, Ohio, Raymond B. Benzinger, Washington, D. C., Paul J. Killion, Asst. U. S. Atty., Harrisburg, Pa., James J. Haggerty, Scranton, Pa., Alan Raywid, Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

Plaintiff has filed this defamation action, asserting the court's diversity jurisdiction. Presently before the court are three defense motions. Defendant Bishop has moved to dismiss and to quash service of process on the grounds that the court lacks both subject matter jurisdiction over the action and personal jurisdiction over him, that venue is improper, and that he was not properly served. Defendants P. J. Kanistros and Poli-Com, Inc. have moved to dismiss and to quash service of process on the grounds that the court lacks personal jurisdiction over both the movants, that venue is improper, and that neither movant was properly served. Defendant Harsha, a member of the United States House of Representatives, who is named in Counts I through III of this ten-count complaint, has moved to dismiss or, in the alternative, for summary judgment, on the grounds that (1) the conduct upon which plaintiff bases his claim in the three counts, *see infra*, is legitimate legislative activity and as such is absolutely privileged under the Speech or Debate Clause of the United States Constitution; (2) the conduct complained of which involved reports to government officials regarding a supposed violation of federal law is constitutionally privileged; and (3) defendant Harsha's actions are privileged under the First Amendment because plaintiff is a public official and there has been no showing of actual malice under the standards as originally set out in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The motions of defendants Bishop, Poli-Com, Inc., and Kanistros will be denied. Defendant Harsha's motion will be granted and he will be dismissed from the action.

## I. THE MOTIONS OF DEFENDANTS BISHOP, POLI–COM, INC., AND KANISTROS

### A. The Facts

For the purpose of ruling on these two motions the court accepts as true the facts as set out in the complaint and the exhibits attached thereto. According to the complaint plaintiff is a resident of Harrisburg, Pa. and, at the time of the alleged defamation was a United States Navy civilian employee working as a Supervisory Contract Negotiator at the United States Navy Ships Parts Control Center (SPCC), Mechanicsburg, Pa.[1] Defendant Bishop is a resident of Washington, D.C. Defendant Kanistros is a resident of Ohio and is president of defendant Poli-Com, Inc., an Ohio corporation with its place of business in Ohio. It is alleged that the amount in controversy, exclusive of interest and costs, exceeds ten thousand ($10,000) dollars.

On or about August 19, 1976, defendant Bishop composed and sent a letter to the Honorable Donald Rumsfeld, then Secretary of Defense, which allegedly contained defamatory material directed at plaintiff. A certified copy of that letter was sent to, among other places, SPCC at Mechanicsburg, Pa. It is alternatively alleged that defendant Bishop was acting both individually and as an agent for defendants Poli-Com, Inc. and Kanistros when he wrote and published the letter. It is asserted that defendant Bishop, by "republication of the

---

1. He is apparently still employed as such.

said defamatory matter, has blackened the reputation of plaintiff and has exposed Plaintiff to contempt and ridicule in Plaintiff's community." *See* doc. No. 1, ¶ 54.

Defendant Bishop wrote another letter to Mr. Rumsfeld on or about January 11, 1977, which also allegedly contained defamatory material directed at plaintiff. A copy of this letter was sent to "SPCC." *See* document No. 1, exhibit E. The court accepts this as being SPCC–Mechanicsburg, Pa. In writing and publishing this letter it is claimed that defendant Bishop was acting both individually and as agent for defendants Poli-Com, Inc. and Kanistros.

Defendant Poli-Com, Inc., on or about July 21, 1977, sent a letter to the Honorable Neal Smith, then Chairman of the Small Business Committee, United States House of Representatives. This letter was signed by defendant Kanistros as president of Poli-Com, Inc. It is alleged that this letter also contained defamatory material directed at plaintiff. It is stated in the complaint that copies of this letter were sent to the persons "therein denoted." But there is nothing in the letter to indicate that a copy was sent to Pennsylvania or anywhere else. Nevertheless, it is alleged that defendant Poli-Com, Inc. "by republication of the said defamatory matter, has blackened the reputation of Plaintiff and has exposed Plaintiff to contempt and ridicule in Plaintiff's community." *See* Doc. No. 1, ¶ 76. Plaintiff also claims that defendant Kanistros, by writing and signing this July 21st letter, was acting in his own interest and that this was not authorized by Poli-Com, Inc.

Lastly, it is asserted that defendants Bishop, Kanistros, and Poli-Com, Inc. all conspired to deprive plaintiff of his good name and for the purpose of acquiring government contracts for Poli-Com, Inc. Plaintiff also contends that the allegedly defamatory statements made by defendant Harsha, *see infra,* were derived from the hereinbefore-mentioned letters and from other oral and written communications made to defendant Harsha. There are no allegations that any of the latter communications took place in Pennsylvania.

### B. *Discussion Regarding Defendant Bishop's Motion*

As stated supra, defendant Bishop has moved to dismiss the complaint and quash service of process on the grounds that the court lacks both subject matter jurisdiction over the action and personal jurisdiction over him, that he was not properly served, and that venue is improper. As to the lack of subject matter jurisdiction, although it is not clear, it seems from movant's brief that this argument is not being pursued.[2] Furthermore, the allegations of the complaint regarding subject matter jurisdiction have not been challenged. Hence, the court may permit plaintiff to rest on those allegations. *See Jaconski v. Avison Corp.,* 359 F.2d 931, 934 (3rd Cir. 1966). They indicate that the requirements of 28 U.S.C. § 1332 (Diversity of citizenship; amount in controversy; costs) have been met and, therefore, this court has jurisdiction over the subject matter. In addition, in determining whether the allegation of jurisdictional amount is sufficient to grant the court subject matter jurisdiction, the test is whether the allegation is made in good faith, i. e., the action will not be dismissed unless it appears to a legal certainty that the jurisdictional amount cannot be met. *See Davis v. Shultz,* 453 F.2d 497 (3rd Cir. 1971); *Jaconski,* supra, 359 F.2d at 934–935. I believe the allegations of the complaint meet that test.

Turning to the question of personal jurisdiction, the power of a federal court which is entertaining a suit based on diversity of citizenship to assert in personam jurisdiction over a nonresident or out-of-state defendant depends on two factors. First, the law of the state in which the federal court sits must confer in personam

---

**2.** The court received very little help from the briefs submitted by the parties in regard to the motions by defendants Bishop, Kanistros, and Poli-Com, Inc. Any future motions must be supported and opposed by competent briefs, i. e., briefs which cite appropriate legal precedent and which evidence some research and understanding of the subject area.

jurisdiction over the out-of-state defendant and secondly, if it does, the exercise of this in personam jurisdiction must not violate the due process requirements of the United States Constitution. *See Hicks v. Kawasaki Heavy Industries,* 452 F.Supp. 130 (M.D.Pa. 1978); *George Transport and Rigging Co., Inc. v. International Publications Equipment Corporation,* 425 F.Supp. 1351 (E.D. Pa.1977). Plaintiff has the burden of pleading and proving jurisdiction. *See Kenyatta v. Kelley,* 430 F.Supp. 1328 (E.D.Pa.1977).

■ Plaintiff relies on two sections of the old Pennsylvania Long Arm Statute, 42 Pa.Cons.Stat. § 8301 et seq.,[3] as the basis for assertion of personal jurisdiction over defendant under Pennsylvania law, specifically §§ 8303 and 8305. Section 8305 provided:

Causing harm by individuals

Any nonresident of this Commonwealth who, acting outside of this Commonwealth, individually, under or through a fictitious business name, or through an agent, servant, or employee, shall have caused any harm within this Commonwealth on or after August 30, 1970, shall be subject to service of process in any civil action or proceeding instituted in the courts of this Commonwealth arising out of or by reason of any such conduct. Service of process in any such civil action or proceeding shall be effected through the Department of State as provided in this chapter.[4]

Defendant Bishop acted outside the Commonwealth of Pennsylvania when he sent the allegedly defamatory letters to Mr. Donald Rumsfeld. He was also acting outside the Commonwealth when he sent copies to SPCC, Mechanicsburg, Pa. It is claimed that the publication of the alleged defamatory material caused plaintiff harm in his Pennsylvania community.[5] Therefore, in personam jurisdiction is proper under the old Pennsylvania long arm statute. *Cf. Kurtz v. Draur,* 434 F.Supp. 958 (E.D. Pa.1977).[6]

■ As to the constitutional question, i. e., whether the assertion of in personam jurisdiction here offends the due process clause, since defendant is a nonresident and nondomiciliary of Pennsylvania who was not present in the state when served and who has not consented to suit, the constitutional standard to be applied is the "minimum contacts" test which was first set out by the United States Supreme Court in *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Due process requires that the defendant have "certain minimum contacts with (the forum state) such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice'." *International Shoe Co. v. Washington,* supra at 316, 66 S.Ct. at 158 quoting *Milliken v. Meyer,* 311 U.S. 457, 61 S.Ct. 339, 85 L.Ed. 278 (1940).

The "minimum contacts" test does not allow for mechanical application. Also, since *International Shoe* involved the issue of under what circumstances a state could assert personal jurisdiction over an out-of-state *corporation* and since many of the subsequent cases dealt with a commercial setting, it is somewhat difficult to apply the reasoning of many of the cases considering

---

**3.** This long arm statute was repealed by the Judiciary Act of 1976, P.L. 586, No. 142. Pa. Stat.Ann. tit. 42 § 5301 et seq. (Purdon, Supp. 1977). However, this new act did not go into effect until on or about June 27, 1978.

**4.** The new act provides that a Commonwealth tribunal may exercise jurisdiction over a person who has caused harm or tortious injury in this Commonwealth by an act or omission outside the Commonwealth. It also provides that jurisdiction of the Commonwealth may, where the individual is not present or domiciled in the Commonwealth when process is served and has not consented to process, be exercised over

the individual to the fullest extent permitted by the United States Constitution. Pa.Stat.Ann. tit. 42 § 5322 (Purdon, Supp.1977).

**5.** This is a different situation from that where harm is caused outside the state and residual effects are felt inside the state.

**6.** Also, since I find that personal jurisdiction here is constitutionally permissible, *see infra,* in personam jurisdiction is proper under the new Pennsylvania long arm statute. *See* n. 3, *supra.*

the "minimum contacts" test to the case currently before the court. Nevertheless, the "minimum contacts" test is the standard to be applied here. *See Kulko v. Superior Court of California,* 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978).

Important factors in determining whether this test has been met are the quality of the contacts between the defendant and the forum state, *see McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), whether the cause of action flows from the contact or contacts, and whether the defendant has purposefully availed himself of the privilege of conducting activities in the forum state. *See Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *Scheidt v. Young,* 389 F.2d 58 (3rd Cir. 1968). Also, where a defendant's actions outside the state have caused effects inside the forum state, an important consideration, albeit not controlling, is whether these effects within the state were, or should have been, foreseeable. *Cf. McBreen v. Beech Aircraft Corp.,* 543 F.2d 26 (7th Cir. 1976). Lastly, although not binding on the court, I believe that the American Law Institute's Restatement (Second) of Conflicts § 37 (1971), quoted in *Kulko,* supra, 436 U.S. at 96, 98 S.Ct. at 1699, states a proposition which I believe is helpful in attempting to frame the correct analytical framework. Section 37, inter alia, provides:

A state has power to exercise judicial jurisdiction over an individual who causes effects in the state by an act done elsewhere with respect to any cause of action

arising from these effects unless the nature of the effects and the individual's relationship to the state make the exercise of such jurisdiction unreasonable.

With all the above considerations in mind, I turn now to the facts of this case.[7]

As stated supra, it is alleged that defendant Bishop wrote letters containing defamatory material directed at plaintiff, that defendant Bishop mailed copies of these letters to plaintiff's place of employment at Mechanicsburg, Pa., and that these letters caused harm to plaintiff within Pennsylvania. This is the extent of defendant's connection to the state of Pennsylvania and, although it is not overwhelming,[8] I believe that it is sufficient to satisfy the due process requirements of the United States Constitution. First, defendant's connection to the state is based upon actions from which plaintiff's claim arose. Secondly, I believe it is foreseeable that if one defames another it will cause harm to that other person within his community, especially when copies of the defamatory material are sent to that community. And by sending those copies defendant Bishop has, in a sense, purposefully availed himself of the opportunity of conducting an activity in the state of Pennsylvania.[9] Furthermore, Pennsylvania has an interest in protecting its citizens from harm. Lastly, although much of the evidence regarding whether there has been a tort will be documentary, the evidence concerning whether plaintiff has been injured within his community may, if this action proceeds to trial, involve testimony by Pennsylvania area residents.

---

**7.** Movant has not advanced any argument that because this is a defamation action and, hence, the first amendment may be implicated, that different considerations of personal jurisdiction should be taken into account. *See* generally 4 Wright and Miller, Federal Practice and Procedure, § 1073 (1969). Given that fact, plus the fact that we are not dealing with a publication by a newspaper or magazine or the like, I do not think that a discussion of the First Amendment vis-a-vis personal jurisdiction is called for or that this case warrants a different analytical framework than set out above.

**8.** The fact that the contacts are not extensive is not surprising given that this is a defamation

action against an out-of-state defendant. Such an action would not ordinarily carry with it an extended connection between the defendant and the forum state. ·

**9.** This is different from the situation presented in *McBreen v. Beech Aircraft Corp.,* 543 F.2d 26 (7th Cir. 1976), where the only contact between the forum state and the defendant was his answer to an unsolicited phone call from a reporter working for a magazine which, unbeknownst to defendant, was located in the forum state. The answers were subsequently published in the forum state.

I believe that on balance, given all the factors present, it is neither inequitable nor unreasonable to require that defendant Bishop appear here for the purposes of this action.

■ The two remaining issues in this motion are whether process was correctly served and whether venue is proper. As to service of process,[10] rule 4 of the Federal Rules of Civil Procedure permits service to be made here in accordance with the state law in existence at the time service was made. *See* 4 Wright and Miller, Federal Practice and Procedure, § 1112 (1969). Service was made on or about December 19, 1977. The applicable Pennsylvania statute at that time was the old Pennsylvania long arm statute, specifically 42 Pa.Cons.Stat. § 8307. It appears that the requirements of that section have been met, *see* document No. 2, U.S. Marshals Service, Process Receipt and Return, filed December 27, 1977, and that, therefore, service of process has been correctly effectuated.

■ As to venue, although counsel on both sides have been arguing in their briefs as to whether the claim arose here, the simple fact is that since this action appears to be based solely on diversity jurisdiction, venue is proper because plaintiff's unchallenged complaint alleges that he resides in this court's district. *See* 28 U.S.C. § 1391(a). Defendant Bishop's motion will be denied.

C. *Discussion Regarding the Motion of Defendants Kanistros and Poli-Com, Inc.*

■ Defendants Poli-Com, Inc. and Kanistros do not dispute that Mr. Bishop was acting as their agent when he wrote the letters and mailed copies to Pennsylvania. There is the added allegation as to these two defendants that the letter sent to Mr. Smith caused plaintiff harm in his community. As to defendant Kanistros, the same analysis as applied above with Mr. Bishop's motion applies here and personal jurisdiction is proper. As to defendant Poli-Com, Inc., Section 8309(b) of the old Pennsylvania long arm statute makes the statutory reach with out-of-state corporations in regard to personal jurisdiction coextensive with the constitutional requirements of due process.[11] Hence, the constitutional analysis as applied to Mr. Bishop's motion applies here and personal jurisdiction is properly asserted over defendant Poli-Com, Inc. Furthermore, it appears that service of process has been properly effectuated as to both these defendants, *see* document No. 2, U.S. Marshals Service Process Receipt and Return, filed December 27, 1977, and that venue is proper, *see* 28 U.S.C. § 1391(a). These motions will similarly be denied.

II. *DEFENDANT HARSHA'S MOTION*

A. *The Facts*

■ Rule 56(e) of the Federal Rules of Civil Procedure provides in pertinent part:

When a motion for summary judgment is made and supported as provided in this rule, *an adverse party may not rest upon the mere allegations or denials of his pleading*, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him. (emphasis added)

In support of his motion for summary judgment defendant Harsha submitted his own affidavit, the affidavit of the Clerk of the United States House of Representatives, plus numerous exhibits. Part of defendant Harsha's affidavit controverts some of the most pertinent and important allegations of the complaint, *see infra*. Plaintiff originally did not submit any affidavits or other material, besides his brief, in opposing the motion. However, after defendant, in his reply brief, pointed out plaintiff's obligation under the summary judgment rule, an affidavit of plaintiff Rusack along with other

---

10. The service of process rules do not affect jurisdiction or venue. *See* Fed.R.Civ.P. 82.

11. The new long arm statute does not change this.

material was submitted by plaintiff. The court will consider this material as if it were submitted with the opposition brief. But, in general, this material, including the affidavit of Mr. Rusack, does not controvert the relevant portions of Mr. Harsha's affidavit and the other supporting documents. Consistent with the proper procedure for ruling on a summary judgment motion, the court accepts as true facts alleged in those parts of the complaint which are uncontroverted by the movant, facts alleged in plaintiff's affidavit and in his documents submitted in opposition to the motion, and those parts of the material submitted in support of the motion, particularly the affidavit of defendant Harsha, which are uncontroverted by plaintiff.

According to plaintiff's affidavit, he is a Supervisory Contract Negotiator (formerly entitled Supervisory Procurement Agent) at the SPCC. His authority is derived from the Armed Forces Procurement Regulations, specifically 32 C.F.R. 1–400 et seq. He is one of eleven individuals who have buying and contracting officer authority at the SPCC. His duties include solicitations and requests for proposals. Furthermore, as a contracting officer at a purchasing office such as the SPCC at Mechanicsburg,[12] he is authorized to enter into contracts in the name of and on behalf of the United States Government, by, inter alia, formal advertising and negotiating. See 32 C.F.R. 1–402. There is a dispute as to whether, after a contract has been entered into, plaintiff becomes involved with the administration of the contract. Plaintiff states he has no authority regarding administration of contracts.

Defendant Harsha is a Representative in the United States House of Representatives from the Sixth Congressional District of Ohio. He is the ranking minority member (Republican) of the House Public Works Committee. He is involved with, and has a particular concern in regard to, the spending policies of the United States Government. See document No. 16, affidavit of William Harsha, p. 2-4. In July of 1977, Mr. Harsha was contacted by Mr. Bishop[13] involving "military procurement irregularities and taxpayer waste." See affidavit of William Harsha, id., at p. 5.[14] Mr. Bishop presented Mr. Harsha with material which, inter alia, dealt with plaintiff Rusack and his involvement with a particular contract and award. The material was reviewed by a member of Mr. Harsha's staff who then forwarded a prepared speech to the Congressman, who reviewed it and approved it for delivery and publication in the Congressional Record of August 3, 1977. It is this speech and its August 3rd publication in the Congressional Record which forms the basis of Count I of the complaint. It is alleged that the August 3rd speech contained defamatory material directed at plaintiff, specifically that it charged plaintiff with dishonest and illegal conduct, fraudulent and unethical practices, and collusion and conspiracy to defraud.

---

12. Movant's brief asserts that the SPCC is a purchasing office. This assertion is borne out by some of the accompanying material, see, for example, document 16, exhibit 16. Plaintiff does not dispute that SPCC Mechanicsburg is a purchasing office.

13. According to plaintiff Rusack's affidavit, Mr. Bishop is a paid representative of defendant Poli-Com, Inc.

14. Mr. Harsha first met Mr. Bishop in 1969, after being advised that Mr. Bishop was knowledgeable regarding Department of Defense procurement practices and had been an editor of a newsletter dealing with military procurement. The outcome of this meeting was that Mr. Bishop presented Mr. Harsha with material dealing with procurement abuse or irregularity.

This material was reviewed by Harsha's staff and was then presented to the House in the form of a speech which Mr. Harsha caused to be inserted in the Congressional Record of June 4, 1969. It appears from the material placed in the Congressional Record of August 3, 1977, that Mr. Kanistros was also involved in the dispute in 1969. He had filed a complaint with the General Accounting Office (GAO) regarding the award by the Air Force of a particular contract and alleging that his company, the low bidder, had improperly not been given the contract. Apparently the GAO agreed that Mr. Kanistros' firm should have been awarded the contract. See document 16, exhibits 1, 10, and 11.

After the speech, by letter dated August 9, 1977, *see* document No. 16, exhibit 17, Mr. Harsha wrote a letter to the Commanding Officer, Admiral T. J. Allhouse, at the SPCC in Mechanicsburg, requesting the underlying contract files and other material concerning the award which was part of the basis of the August 3rd speech. Admiral Allhouse responded to this request on August 22, 1977, by forwarding to Mr. Harsha a large amount of material. Mr. Harsha made this material available to Mr. Bishop in order for the latter to determine whether it was responsive to the August 9th request. Mr. Bishop determined that the material was not fully responsive. On August 31st, Mr. Harsha wrote another letter to Admiral Allhouse wherein he again requested certain material and also made numerous statements. It is this letter that forms the basis of Count III of the complaint. It is alleged that the letter contained defamatory material directed at plaintiff in that it charged him with dishonest and illegal conduct, fraudulent and unethical practices, and collusion and conspiracy to defraud. Defendant Harsha states that neither he nor his office distributed this letter to the general public. This is not controverted.

The SPCC responded to this second request by forwarding additional information to Mr. Harsha. All the material was again analyzed with Mr. Bishop's help. Mr. Harsha states in his affidavit that although he still felt the material was not fully responsive, he believed that it confirmed the allegations contained in his August 3rd speech. He also believed that further requests from SPCC would not be fruitful. Once again

Mr. Bishop presented his analysis of the material to a member of Mr. Harsha's staff who edited it and presented it to the Congressman. Mr. Harsha made final editorial changes and on Nov. 22, 1977, "the analysis in speech form was presented to the Clerk of the House for insertion in the Congressional Record by unanimous consent." [15] *See* document 16, exhibit No. 1, affidavit of William Harsha. It is this "speech" which is the basis of Count II in that, once again, it is averred that it contained defamatory material directed at plaintiff.

■ The complaint charges further that Congressman Harsha, subsequent to placing the two speeches in the Congressional Record, maliciously distributed and caused to be republished the text of the speeches. *See* document No. 1, ¶¶ 10 & 22. Defendant Harsha states that on November 30, 1977, he transmitted copies of his correspondence with the SPCC and their responses along with copies of the two Congressional Records containing the speeches referred to above to the United States Attorney for the District of Columbia, the United States Attorney General, and to the Office of the Secretary of Defense. These transmittals were marked secret and were not generally circulated. Other than that transmittal and the ordinary way in which the Congressional Record is circulated,[16] defendant Harsha denies in his affidavit that he republished or distributed the text of the two speeches contained in the Congressional Record. Plaintiff does not controvert this, except in the complaint. As stated supra, plaintiff may not rest on the allegations of the complaint when a summary judgment motion is

---

**15.** Apparently only the House as a whole can authorize the publication of a speech not actually delivered on the floor. *See* Rule XXIV of the Rules of the House of Representatives, § 929, document 16, exhibit 3. Although it is not completely clear, it appears to the court that the speech of August 31st was also not actually delivered on the floor of the House.

**16.** The printing and distribution of the Congressional Record is basically controlled by statute. *See* 44 U.S.C. § 901 et seq., and by House and Senate Rules and by a Joint Committee on Printing, composed of House and Senate Members. *See* document No. 16, exhibits 3 and 13.

It appears from 44 U.S.C.A. § 906 (Supp.1978) that each member of the House of Representatives gets forty copies, thirty-four of which may only be transferred to public agencies and institutions. Congressman Harsha states that he receives six copies, three of which he distributes among his staff in conjunction with the performance of their official duties. Furthermore, he supplies the Public Printer with a list of thirty people or organizations which receive copies of all the Congressional Records. The Congressional Record is also supplied to numerous people and organizations and it may be sold by the Public Printer.

properly supported, such as the one presently before the court. The court accepts for the purpose of this motion the fact that there has been no republication of the speeches contained in the Congressional Records of August 31, 1977, and November 22, 1977, except as detailed by defendant Harsha.[17]

## DISCUSSION

The behavior upon which the complaint is based can be divided into three categories: (1) the insertion of the two speeches into the Congressional Record and the general distribution of those Congressional Records; (2) the August 31, 1977 letter to Admiral Allhouse; and (3) the forwarding by defendant Harsha of the copies of the two Congressional Records and copies of the correspondence between himself and the SPCC to the United States Attorney General, the United States Attorney for the District of Columbia, and the Office of the Secretary of Defense. Summary judgment is sought on the grounds: (1) that all the activity is absolutely privileged under the Speech or Debate Clause; (2) that reports of alleged criminal behavior to appropriate executive officials is constitutionally privileged and (3) that criticism of plaintiff Rusack is privileged under the First Amendment because the plaintiff is a public official and the record establishes that there is no "New York Times malice." *See infra.* I will analyze each of the categories of behavior under each of the grounds asserted as a basis for summary judgment.

### A. *Legislative Immunity*

Article 1, Section 6, Clause 1 of the United States Constitution, commonly referred to as the Speech or Debate Clause (hereinafter the Clause) states in pertinent part:

. . . Senators and Representatives . . . for any Speech or Debate in either House . . . shall not be questioned in any other Place.

The purpose of this Clause is to insure that Congress is able to perform its legislative functions independently and without fear of reprisal or intimidation. *See Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975). Furthermore, although not necessarily borne out by all the cases, it is often stated that the Clause is to be read broadly to effectuate its purposes. *See United States v. Johnson,* 383 U.S. 169, 180, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966). When the United States Supreme Court first dealt with a challenge to this Clause, it said when discussing to what behavior the Clause applies:

In short to things generally done in a session of the House by one of its members to the business before it.

*See Kilbourn v. Thompson,* 103 U.S. 168, 204, 26 L.Ed. 377 (1880). Consistent with this, the Supreme Court has held that the standard to be met when determining whether the actions of a Congressman are encompassed by the Clause is whether those actions are within the "sphere of legitimate legislative activity." *See Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 501, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975) citing *Doe v. McMillan,* 412 U.S. 306, 312–313, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); *United States v. Brewster,* 408 U.S. 501, 516, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972) and others. If the actions do fall within such sphere, they are absolutely privileged and

---

17. Plaintiff requests that this court not render a decision on this motion prior to his having an opportunity to engage in further discovery and to depose defendant Harsha regarding the issue of republication. Even in an ordinary action, one not involving Legislative Immunity or the First Amendment, I would not be inclined to grant such a request where a plaintiff has nothing upon which he can controvert an affidavit supporting a summary judgment motion. In the context of this motion the request is particularly inappropriate. First, it has been clearly stated that the Speech or Debate Clause, *see infra,* protects Congressmen both from the possible consequences of litigation itself and from the burden of defending themselves. *See Dombrowski v. Eastland,* 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967). Secondly, when an action involves the First Amendment, the court should be careful that it does not needlessly create a situation which could have a chilling effect on the exercise of rights under that amendment. Granting plaintiff's request could have such an effect.

the Congressman may "not be questioned in any other Place," including this court in a civil action.

█ Plaintiff concedes that defendant Harsha's speeches and their publication in the Congressional Record are activities which are absolutely privileged and protected by the Clause, see document No. 24, p. 3.[18]

█ The August 31, 1977 letter to Admiral Allhouse is also behavior which is encompassed by the Clause. It has long been held that investigation by a Congressman regarding issues over which legislation may be had is legitimate legislative activity and, therefore, protected by the Speech or Debate Clause. See Eastland v. United States Servicemen's Fund, 421 U.S. 491, 504, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975); Doe v. McMillan, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957); McGrain v. Daugherty, 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580 (1927); McSurely v. McClellan, 180 U.S. App.D.C. 101, 110–11, 553 F.2d 1277, 1286–8 (En Banc 1976); writ of cert. dismissed as improvidently granted 434 U.S. 888, 98 S.Ct. 260, 54 L.Ed.2d 173 (1978).[19] The power over appropriations and expenditures is at the heart of the business of Congress. Article 1, Section 8, Clause 13 of the United States Constitution specifically gives Congress power over the maintenance of the Navy. Knowing how the Navy spends the money allotted to it by Congress is essential if Congress is going to be able to exercise its power with any competency. Defendant Harsha's letter to Admiral Allhouse was an attempt to get needed information, and as such, it must be afforded the protection of the Clause.[20]

As to the forwarding of the copy of the letter to Admiral Allhouse and the two Congressional Records to the United States Attorney for the District of Columbia, the United States Attorney General, and the Office of Secretary of Defense, since that behavior is protected under other constitutional provisions, see infra, I have decided not to reach the question of whether it is encompassed by the Clause.

B. *The Right to Report Possible Criminal Violations to the Appropriate Officials*

The United States Supreme Court stated in *In re Quarles and Butler,* 158 U.S. 532, 15 S.Ct. 959, 39 L.Ed. 1080 (1894):

It is the duty and the right, not only of every peace officer of the United States, but of every citizen, to assist in prosecuting, and in securing the punishment of, any breach of the peace of the United States. . . . It is likewise his right and his duty to communicate to the executive officers any information which he has of the commission of an offense

---

**18.** I agree that these actions are absolutely privileged. Making a speech and/or following the procedures for submission of the speech for publication in the Congressional Record with all that generally implies are actions normally done in a session of the House by its members, constitute "legitimate legislative activity" and as such are absolutely privileged under the Clause. See Doe v. McMillan, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); Doe v. McMillan, 185 U.S.App.D.C. 48, 566 F.2d 713 (1977). The fact that the speeches may have contained defamatory material directed at plaintiff does not affect the privilege. See Doe v. McMillan, supra, 412 U.S. at 312–313, 93 S.Ct. 2018.

**19.** In Hutchinson v. Proxmire, 579 F.2d 1027 (7th Cir. 1978), the parties admitted that the investigative actions by Senator Proxmire or his aides aimed at gathering information on public spending from administrative agencies was behavior encompassed by the Speech or Debate Clause.

**20.** It is arguable that if the letter contained defamatory material directed at plaintiff, it was not within the legislative sphere or legitimate legislative activity. In some situations it may be that a primarily libelous letter which is only incidentally seeking information might not be protected under the Clause. But here the letter was the second one defendant Harsha had sent to Admiral Allhouse in an attempt to gather information. The allegedly defamatory matter might well have been considered necessary by the Congressman in order to pinpoint the exact material he was after. In any event, I am not willing in the face of a legitimate and somewhat extensive legislative inquiry to strip away the legislative immunity unless the fact situation clearly warrants it. I do not believe this case to be of such a nature.

against those laws; and such information, given by a private citizen, is a privileged and confidential communication, for which no action of libel or slander will lie . . . .

The Court did not specify any particular constitutional provision upon which this right and duty rested, but rather felt it arose out of the nature and structure of our system of government and of the constitution.

This "right to inform" is analogous to the First Amendment's right to petition the government for a redress of grievances. In *Stern v. United States Gypsum, Inc., et al.,* 547 F.2d 1329 (7th Cir. 1977), cert. denied 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977), plaintiff had been an agent of the Internal Revenue Service and involved with an audit of defendant United States Gypsum, Inc. He brought suit under 42 U.S.C. § 1985(1), with pendent state law claims sounding in defamation and malicious interference with contract. He alleged that the individual defendants, corporate officers of defendant United States Gypsum, Inc., conspired to impede him in the performance of his duties by making false and defamatory charges of serious professional misconduct to his Internal Revenue Service superiors regarding his behavior during the audit of United States Gypsum, Inc. The question before the appellate court was whether these allegations stated a claim under 42 U.S.C. § 1985(1). Although the court believed that the complaint may have stated a claim, it felt that the alleged behavior of defendants was constitutionally protected. The court stated:

> We think it plain that presenting complaints to responsible government officials about the conduct of their subordinates with whom the complainer has had official dealings is analogously central to the protections of the right to petition. pp. 1342–1343
>
> . . . we consider it irrelevant to the applicability of the right to petition that

its exercise might have the effect of causing professional injury to the official about whom complaints are made . . . . p. 1343

Although defendant Harsha may not have had official dealings with plaintiff Rusack in the same manner as the defendants in *Stern,* supra, he did have official dealings in the sense that overseeing how the Navy spends part of its allotted monies is part of his general official duties.

The complaint alleges that plaintiff was defamed by defendant Harsha in regard to the performance of his (plaintiff's) official duty, specifically alleging that Mr. Harsha accused plaintiff of violating 18 U.S.C. § 1001 (Statements or entries generally; this is the first section of Chapter 47— Fraud and False Statements). The whole thrust of the complaint and the brief in opposition to the motion is that defendant Harsha has accused plaintiff of criminal acts.[21]

■■■ The right to inform federal officials of possible violations of federal law continues to be constitutionally protected. *See United States v. Guest,* 383 U.S. 745, 771, 779, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966), Harlan, J., concurring in part and dissenting in part; Brennan, J., concurring in part and dissenting in part; *Williams v. Allen,* 439 F.2d 1398 (5th Cir. 1971).[22] I believe that the letter to Admiral Allhouse and the forwarding of the materials to the United States Attorney for the District of Columbia, the United States Attorney General, and the office of the Secretary of Defense are protected by this constitutional right to inform, afford defendant immunity, and, hence, cannot form the basis of a defamation action.

C. *First Amendment—Freedom of Speech*

■■■ Beginning with *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1966), the Supreme Court has strictly limited, as a matter of

---

**21.** *See* ¶¶ 10 & 15 of Count I, ¶¶ 25 & 28 of Count II, and ¶ 37 of Count III. Also, *see* Doc. 24, plaintiff's opposition brief, p. 1.

**22.** The fact that defendant Harsha is a Congressman does not detract from the fact that he too is protected by constitutional rights applicable to the general citizenry.

constitutional law, the right of a public official to sue and recover for alleged defamations relating to his or her official conduct. The first amendment right of free speech provides a qualified immunity from liability for defamation actions brought by public officials and others.[23] If a plaintiff is a public official and the alleged defamation relates to his official conduct he may only recover if he can show that the defamatory statement was made with "actual malice," (hereinafter referred to as New York Times malice), i. e., with knowledge that the statement was false or with reckless disregard as to whether it was false or not. This New York Times malice must be proved by the plaintiff by clear and convincing evidence or by "convincing clarity." *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Dickey v. CBS, Inc.*, 583 F.2d 1221 (3rd Cir. 1978). A bare allegation of New York Times malice is not enough to withstand a summary judgment motion. *See Hutchinson v. Proxmire*, 431 F.Supp. 1311 (W.D.Wis.1977), aff'd 579 F.2d 1027 (7th Cir. 1978); *Fram v. Yellow Cab Company of Pittsburgh*, 380 F.Supp. 1314, 1335 (W.D.Pa. 1974).

■ The first issue is whether plaintiff is a public official. Although this is sometimes a difficult question, I believe that plaintiff clearly qualifies as such.[24] In *Rosenblatt v. Baer*, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), the Supreme Court, in discussing who qualifies as a public official for First Amendment purposes, stated:

It is clear, therefore that the 'public official' designation applies at the very least to those among the hierarchy of government who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.

. . . The thrust of New York Times is that when interests in public discussion are particularly strong, as they were in that case, the Constitution limits the protections afforded by the law of defamation. Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, . . . the New York Times malice standards apply.

. . . The employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy.

pp. 85–86, 89, fn. 13, 86 S.Ct. pp. 675–676 n. 13.

Plaintiff Rusack, in his complaint, states that the defamatory material which defendant Harsha allegedly directed at him "impede plaintiff's ability and fitness to serve the United States people in a position of trust." *See* Doc.No.1, ¶¶ 13(e), 26(e), and 36(e). I agree that plaintiff holds a position of public trust. This is confirmed by 32 C.F.R. 1–113.1, the regulation dealing with the standard of conduct for government personnel engaged in procurement and related activities. Furthermore, as stated supra, plaintiff is involved in solicitations for contracts, requests for proposals, formal advertising, negotiating, and has buying and contract officer authority at the SPCC and, as such, is authorized to enter into contracts in the name of and on behalf of the United States government. Assuming that plaintiff is not involved with the administration of the contracts, it is nevertheless evident that he is intimately involved in the expenditures of public funds, a matter of great importance so that there is an interest in his qualifications and performance beyond the interest which might be associ-

---

**23.** *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) reh. den. 389 U.S. 889, 88 S.Ct. 11, 19 L.Ed.2d 197 (1967).

**24.** Plaintiff does not controvert that he is a public official. However, he does state in his brief that the contention that he is a public official should be raised as a defense in the answer, implying it is not properly raised in a motion for summary judgment. Plaintiff cites no authority for this meritless contention.

ated with any governmental employee. He is, therefore, a public official and since the allegedly defamatory remarks dealt with his performance as such an official the New York Times malice standard must be applied.

Plaintiff, in his affidavit and accompanying exhibits, in effect attempts to show that the allegations made by defendant Harsha were incorrect. Apparently, plaintiff has been exonerated in regard to the contract in question by Navy investigations. And he states that " . . . Mr. Harsha's remarks and allegations have been made with a complete and reckless disregard of the truth." [25] Defendant Harsha, in his affidavit, states that he believed the statements in question to be true when made and that he still believes them to be true. This is not controverted. But the question is whether defendant Harsha has acted with reckless disregard as to the truth or falsity of the statements. Or, as has been stated, with a "high degree of awareness of . . . probable falsity." *See Hutchinson v. Proxmire,* 579 F.2d 1027 (7th Cir. 1978) citing *St. Amant v. Thompson,* 390 U.S. 727, 730–731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Gertz v. Robert Welch, Inc.,* supra, 418 U.S. at 342, 94 S.Ct. 2997.

In *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), the Supreme Court held that the failure to investigate does not satisfy the New York Times malice standard. There defendant St. Amant had been a candidate for public office in Louisiana and had made a televised speech. During the course of this speech St. Amant read a series of questions he had posed to a local union official and the answers the local official gave to those questions. One of those answers defamed plaintiff Thompson. The lower state court had found for plaintiff. An intermediate appellate court reversed, finding that there had been no showing of New York Times malice. The Louisiana Supreme Court reversed the intermediate appellate court,

finding that there was sufficient evidence that St. Amant had recklessly disregarded whether the statements about Thompson were true or false. Several reasons were given supporting this conclusion. St. Amant had no personal knowledge of the activities of Thompson; he had relied solely on the affidavit of the union official, although the record was silent as to the union official's reputation for truthfulness; he did not verify the information with people in the union office who might have known the true facts; he went ahead without considering whether the statements defamed Thompson and heedless of the consequences; and he had mistakenly believed that he was not responsible for the broadcast because he was only quoting the union official's words. The United States Supreme Court found that these considerations did not establish reckless disregard or New York Times malice. The court stated:

> . . . reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice. p. 731, 88 S.Ct. p. 1325.

The court recognized that the New York Times malice standard might allow erroneous and libelous publications to go unredressed. Nevertheless, this is the price that must be paid to " . . . insure the ascertainment and publication of the truth about public affairs . . . ." The court went on to state:

> The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified

---

**25.** Of course, as stated supra, the mere statement, even if contained in an affidavit, that there was New York Times malice, does not meet plaintiff's burden. To reiterate, in order to prevail on the New York Times malice issue,

he must produce facts and/or proof such that it would be possible for a factfinder to decide that New York Times malice has been shown by clear and convincing evidence.

anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. p. 732, 88 S.Ct. p. 1326

Based on the facts in the record, it is clear that, as a matter of law, there can be no finding of New York Times malice against defendant Harsha.[26] Assuming that Mr. Bishop is a paid employee of Poli-Com, Inc., that Mr. Harsha relied almost exclusively on his (Bishop's) analysis of the situation, and that this analysis was wrong, the standards as set out in *St. Amant v. Thompson*, supra, have not been met. Here defendant Harsha had satisfactory dealings with Mr. Bishop in the past regarding military procurement practices. A member of defendant Harsha's staff always reviewed the materials, which appear to this court to be extremely complex. The most that possibly can be said here is that defendant Harsha did not investigate as thoroughly as he might have, by, for example, contacting those who might present a different viewpoint from that espoused by Mr. Bishop.[27] This clearly does not satisfy the New York Times malice standard as set out in *St. Amant,* supra. All the alleged behavior upon which the complaint against Mr. Harsha is based is protected by the First Amendment and summary judgment is appropriate under the circumstances and will be granted.

In sum, legislative immunity protects defendant Harsha from suit based on the two speeches, their insertion in the Congressional Record, and the letter to Admiral Allhouse. The right to inform creates a constitutional immunity from suit for the letter to Admiral Allhouse and the forwarding of the material to the United States Attorney General, the United States Attorney for the District of Columbia, and the Office of the Secretary of Defense. And the constitutional privilege of the First Amendment encompasses all the behavior upon which this action is based because, as a matter of law, plaintiff is a public official and there can be no showing of New York Times malice based on the facts in the record.

---

**26.** Plaintiff has requested that if the court finds the averments of malice insufficient, leave be granted to amend the complaint. This request is obviously being denied. First, an amended complaint will be of no assistance to plaintiff when he cannot, via affidavit or with other appropriate material, controvert the relevant portions of the affidavits and material supporting the summary judgment motion. Secondly, there are the First Amendment and legislative immunity considerations. *see* n. 17 supra, which make granting summary judgment particularly appropriate where the facts warrant it. It may well be that in the situation such as the one presented here, a grant of summary judgment is the rule rather than the exception. *See Hutchinson v. Proxmire*, 431 F.Supp. 1311 (W.D.Wis.1977), aff'd 579 F.2d 1027 (7th Cir. 1978) and the cases cited therein.

**27.** The facts here are significantly different from those presented in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). For further support that New York Times malice cannot be shown on the facts presented here, *see Dickey v. CBS, Inc.*, 583 F.2d 1221 (3rd Cir. 1978).